ECOLAB, INC., Plaintiff,

v.

AMERIKEM LABORATORIES, INC., and Envirochem, Inc., Defendants.

Nos. Civ.A. 96–437(JAG), Civ.A. 90–4712(JAG).

United States District Court, D. New Jersey.

May 23, 2000.

John N. Bain, Carella, Byrne, Bain, Gilfillan, Cecchi, Steward & Olstein, Roseland, NJ, Thomas L. Hamlin, Richard B. Allyn, Katie Crosby Lehmann, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for Ecolab, Inc.

Frederick Joseph Dennehy, Wilentz, Goldman & Spitzer, P.C., Woodbridge, NJ, Richard L. DeLucia, Charles A. Weiss, Kenyon & Kenyon, New York City, for Envirochem, Inc.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion of plaintiff Ecolab, Inc. ("Ecolab") seeking summary judgment on its claim of literal infringement. Ecolab contends that a line of products of defendant Envirochem, Inc. ("Envirochem") infringes upon one of Ecolab's patents. For the reasons discussed below, Ecolab's motion is granted.

### BACKGROUND

This dispute concerns uniform solid dishwashing detergent casts for use in commercial dishwashing machines. Ecolab patented the detergent and a method for making it under U.S.Patent No. RE 32,818 (the "'818 patent"). Ecolab contends that a line of dishwashing products manufactured by Envirochem infringes Claim 1 of the '818 patent.

Claim 1 covers:

1. A detergent-containing article of commerce comprising:

(a) a three-dimensional, solid, cast, hydrated, substantially uniform alkaline detergent for ware and hard surface washing comprising:

(1) at least about 30% by weight of an alkaline hydratable chemical consisting essentially of alkali metal hydroxide;

(2) an effective amount of a hardness-sequestering agent;

(3) water of hydration, at least a portion of said water of hydration being associated with said alkali metal hydroxide, wherein the alkali metal hydroxide and the hardness

sequestering agent are present in an amount sufficient to render the cast detergent a solid at room temperature by virtue of the water of hydration; and

(b) a receptacle-shaped disposable container surrounding and in contact with said solid, cast, hydrated alkaline detergent composition on all but one surface thereof.

'818 Patent, col. 27, lines 40–60.

In an Opinion dated January 8, 1999 (the "1999 Opinion"), this Court construed the term "substantially uniform" in claim 1 of the '818 patent and denied Envirochem's motion for summary judgment on noninfringement grounds.[1] This Court construed the term to mean "a level of continuity of the elements from top-to-bottom throughout the cast such that a homogenous cleaning solution is formed over the life of the cast." 1999 Opinion at 16.[2] In light of that claim construction, Ecolab now seeks a finding that eight of Envirochem's current solid, cast detergent products literally infringe that properly construed claim.[3]

Envirochem contends that its products are nonuniform detergents with chemical cleaning components stratified or segregated throughout the cast. Envirochem received U.S.Patent No. 5,482,641 (the "'641 patent") on a method for producing stratified solid cast detergents. Envirochem argues that the evidence before this Court indicates that its products are nonuniform, noninfringing detergents. This evidence, in Envirochem's view, should preclude the grant of summary judgment.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Township,* 772

---

1. The Court will not repeat the extensive discussion of the prosecution history of the patent and the procedural history of this action, set forth in the 1999 Opinion.

2. At an earlier stage of this lengthy litigation, Ecolab sought an "immediate and permanent injunction," pursuant to a settlement agreement and final consent judgment, entered on January 5, 1993 in this dispute. In that judgment, Envirochem admitted that its "Jardian" solid cast detergent product line infringed the '818 patent. Upon release of the Envirochem product line at issue here, Ecolab brought its injunction motion. Treating the motion as one for a preliminary injunction, then-District Judge Barry preliminarily construed claim 1 of the '818 patent and determined that Ecolab had not satisfied the criteria for issuance of preliminary equitable relief. The Court held that substantial uniformity did not require perfect homogeneity throughout the cast and clearly covered variations from 0 to 6.6%, since that was an example of substantial uniformity submitted during patent prosecution. That decision did not, as Envirochem argues, limit substantially uniform to that specific numerical range. *See* Opinion, May 31, 1996, Weiss Cert. Ex. O at 13–17. It did, however, suggest that variations of 17.7%, for example, might constitute nonuniformity. *Id.* at 15–16. This Court's claim construction in the 1999 Opinion, which took place after years of discovery and did not limit substantially uniform to any numerical range, supercedes any preliminary claim construction.

3. The alleged infringing products bear product numbers E2000, E2000D, E2000HD, E2000X, E2000XHW, K75, K75W, and K75WD.

F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed.R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue for trial"). "There can be 'no genuine issue as to any material fact' where the nonmoving party's proof is deficient in meeting an essential part of the applicable legal standard, since such failure renders all other facts immaterial." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1537–38 (Fed.Cir.1991) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). In determining whether there are any issues of material fact, the court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences—including on issues of credibility—in favor of the non-moving party. *See Watts v. University of Delaware,* 622 F.2d 47, 50 (3d Cir.1980).

## II. *Literal Infringement*

▮▮▮ "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal*

*IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995). An infringement analysis involves two stages. The first step—claim construction—is a question of law. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). In the 1999 Opinion, this Court construed the only disputed language in the claim at issue.[4] The second step in an infringement analysis, comparing the properly construed claims to the accused infringing product, is a question of fact. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).[5] Although the question of infringement is generally one for a jury, summary judgment of infringement may be granted when a rational jury could only conclude that infringement occurred. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 974–75 (Fed.Cir. 1999) (reversing summary judgment of noninfringement and granting judgment of infringement as matter of law because no reasonable jury could determine that any claim limitation was absent from the accused device).

Ecolab argues that such a situation exists here. It maintains that it has put forth overwhelming evidence demonstrating that no genuine issues exist as to any material facts regarding Envirochem's infringement of every aspect of claim 1 of the '818 patent. Ecolab also contends that Envirochem's opposition does not undermine Ecolab's showing, and therefore, that summary judgment is proper.

### A. *Substantial Uniformity*

In support of its motion, Ecolab has submitted the analysis of the pertinent

---

**4.** The parties do not ask the Court to construe the remaining elements of claim 1, and no such construction is necessary. The other elements of claim 1 are clearly defined and require specific amounts of clearly identifiable substances, or are undisputed to exist in Envirochem's products.

**5.** Given this Court's prior claim construction and the fact that Envirochem does not seek construction of additional claim language, Envirochem's request for a *Markman* hearing is somewhat misplaced. *"Markman"* hearings

are preliminary evidentiary hearings during which testimony of those skilled in the art is offered to assist the court with claim construction. *See EMI Group North America, Inc. v. Intel Corp.,* 157 F.3d 887, 891–92 (Fed. Cir.1998). At oral argument, Envirochem's counsel explained that Envirochem merely sought a hearing to assist the crafting of cogent jury instructions on the Court's claim construction, and not a hearing to construe the claim. Tr. of Oral Argument, Mar. 8, 2000 at 2–5.

Envirochem products by two scientists, Dr. Steven Lentsch and Dr. Martin P. Rigney.[6] Dr. Lentsch analyzed the composition and performance of the dishwashing solution formed as the cast detergent dissolves. Dr. Rigney's findings relate to the compositional structure of the detergent within the capsule. Both scientists conclude that the Envirochem products are substantially uniform,[7] and thus infringe that element of claim 1 of the '818 patent.[8]

## 1. Expert Reports

### a. Personal Knowledge

Envirochem argues that profound flaws in the reports of Drs. Lentsch and Rigney bar their consideration. Absent those opinions and data, Envirochem further contends, myriad genuine issues as to material facts would exist and would preclude summary judgment.

■ Envirochem first asserts that the Lentsch and Rigney reports should be excluded because they were not executed under oath or penalty of perjury. Fed. R.Civ.P. 56(e) demands evidence by affidavits that "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Unsworn statements do not satisfy the rule. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Although the experts did not attest to their findings under oath initially, their reports did not remain unsworn. Both experts adopted their reports under oath

in affidavits submitted in connection with the present motion. *See* Rigney Aff., June 3, 1999 ("Rigney Aff. II") ¶ 2; Lentsch Aff. ¶ 2. These subsequent measures satisfy the requirements of Rule 56(e). *Compare Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir.1989) (rejecting unsworn affidavits where party submitting them did nothing to correct the impropriety), *overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Envirochem, while conceding that the subsequent affidavits meet the requirements of Rule 56(e), contends that the oaths extend only to the experts' ultimate opinions, and that the underlying data are not properly before the Court. The experts attested that the reports contained their "true and correct opinions." *See* Lentsch Aff. ¶ 2; Rigney Aff. II ¶ 2. Envirochem suggests that the experts lacked personal knowledge about the underlying data and are therefore unable to establish the foundation and veracity of the opinions. Thus, Envirochem argues that while the summary opinions may properly be heard, the data themselves may not be considered in deciding this motion. This Court disagrees.

As an initial matter, Fed.R.Evid. 703 permits experts to opine on data of which they lack first-hand knowledge or that are otherwise inadmissible, provided the data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." When the underlying data are

---

**6.** Dr. Lentsch, Ecolab's Principal Product Development Program Leader, holds a Ph.D. in organic electrochemistry. He has been employed by Ecolab in research and development since 1974. *See* Hamlin Aff. Ex. 4. Dr. Rigney, Ecolab's Analytical and Physical Chemistry Manager, holds a Ph.D. in chemistry and has been employed by Ecolab since 1978. *See* Hamlin Aff. Ex. 5.

**7.** Although the specific conclusions of each scientist antedate this Court's claim construction, the Court's construction comports with

that advanced by Ecolab throughout this litigation, and upon which both scientists based their analysis.

**8.** Although this motion focuses on the question of substantial uniformity, Ecolab has also submitted evidence demonstrating infringement of the other elements of claim 1—as it must to obtain summary judgment. That section of the infringement analysis is discussed at Part II(B), *infra*.

independently admissible, they may be admitted, along with the expert opinion.

As it does throughout this motion, Envirochem points to narrow slices of deposition testimony and characterizes that testimony as evidence of flaws in Ecolab's proof. An example of this stratagem occurs in Envirochem's citation of the following segment of an exchange from Dr. Lentsch's deposition:

Q: Who performed each of the tests?

A: A technician that works for me.

Q: What was his or her name?

A: Her name was Kim Huynh.

. . . . .

Q: She performed all three of the tests?

A: Yes.

Q: Did she also perform the analytical work for the alkalinity and ppm of phosphorous?

A: She withdrew samples for our analytical lab to test.

Q: Do you know who did the tests in the analytical lab?

A: No.

Q: What is Ms. Huy[nh]'s title?

A: She is a senior laboratory technician.

Q: In what department?

A: Institutional Research and Development Department.

Q: When the sample was taken every 50 cycles was the sample taken and then transported to the analytical lab or were they all brought over together at the end of the day?

A: They were brought over at the end of the day.

Q: Did you observe the labeling of the samples?

A: Yes.

Q: How were they labeled?

A: I don't recall exactly. They were— well, I don't recall exactly.

Weiss Cert. Ex. B, Lentsch Dep. at 27–28. That testimony hardly contaminates the data. Dr. Lentsch designed the test protocol and supervised its implementation. *See, e.g.,* Hamlin Aff. Ex. 18, Lentsch Dep. at 14–18, 62. Notably, Envirochem has pointed to no legal authority holding that data are inadmissible unless the expert rendering an opinion personally conducted every aspect of the testing. This Court has found none either. Indeed, given the realities of laboratory organization and procedures, such a requirement would eliminate virtually all data from evidence. Envirochem has not shown that Dr. Lentsch lacked personal knowledge and the data upon which his report relies— results of tests designed by him and conducted under his direction—are properly before the Court.[9]

Envirochem also maintains that Dr. Rigney lacked first-hand knowledge of the data on which he opined. His report addressed two issues: the adequacy of Envirochem's quality control testing techniques, and the compositional structure of the detergent casts. It is only with respect to the latter analysis that Envirochem argues Dr. Rigney lacked personal knowledge of critical facts.[10] In connection with Ecolab's 1995 injunction motion, Dr. Rigney analyzed certain data regarding the composition of Envirochem's products. *See* Hamlin Aff. Ex. 8, Rigney Aff., Dec. 18, 1995 ("Rigney Aff. I"), Table 1. His current report reaffirms his earlier assessment. Envirochem argues that Dr. Rigney concedes he had no first-hand knowledge of the data upon which he

9. This, of course, is conditioned upon the Court determining that the tests themselves were reliable and otherwise admissible under Fed.R.Evid. 702. *See* Part II(A)(1)(b), *infra.*

10. Envirochem unquestionably disputes Dr. Rigney's critique of its testing methods. It does not argue, however, that Dr. Rigney lacked adequate knowledge of the underlying facts to put the details of those procedures before the Court.

based his findings of substantial uniformity in his 1995 Affidavit.

Again, close scrutiny of the supposedly damning admissions indicates otherwise. The only information about which Dr. Rigney was unclear was the precise process by which Ecolab obtained the samples—on the market or through discovery—and on what date they were obtained. *See* Weiss Cert. Ex. A, Rigney Dep. at 99–101. Dr. Rigney's reliance on his assistant or another Ecolab employee to procure the products was eminently reasonable and does not call his findings into question. Moreover, Dr. Rigney supervised the sample testing, the results of which were compiled in a written report prepared by one of his assistants, William Feil. *See* Weiss Cert. Ex. A at 104–06; Hamlin Aff. Ex. 5, Rigney Rep. at E–L 003521–37.[11] The fact that Dr. Rigney himself did not compile the data does impugn their accuracy or reliability.

Cases exist where an individual submits an affidavit attempting to introduce the facts underlying statements of a third party, which are inadmissible under both Fed. R.Evid. 602 and 802.[12] Such evidence may not properly be considered on a motion for summary judgment. *See, e.g., Scosche Indus. v. Visor Gear Inc.*, 121 F.3d 675, 680–81 (Fed.Cir.1997) (excluding affidavit containing hearsay statements concerning unfair competition claim); *see also Gostin v. Nelson*, 363 F.2d 371 (3d Cir.1966) (affidavits not based on personal knowledge do not satisfy Fed.R.Civ.P. 56(e)); *Borecki v. Eastern Int'l Management Corp.*, 694 F.Supp. 47, 51 n. 5 (D.N.J.1988) ("hearsay

evidence and evidence not based on personal knowledge may not defeat a summary judgment motion"). Here, by contrast, the reports convey results of tests designed and supervised by the experts. That the experts themselves did not take every single measurement cannot possibly disqualify the data. From the testimony Envirochem has set forth—undoubtedly that which casts the greatest shadow over the reports' integrity—it is clear that both Dr. Rigney and Dr. Lentsch had sufficient personal knowledge of the testing for the data to be admissible.

b. *Reliability Determination*

■ Envirochem raises another preliminary challenge to Dr. Lentsch's report, arguing that his opinion is the result of incompetent, unreliable "junk science" and should be excluded under Fed.R.Evid. 702, as interpreted by the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Rule 702 permits the admission of expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert*, the Court explored the "gatekeeping role" that trial judges serve to ensure that expert testimony admitted under Rule 702 is both relevant and reliable. *See Daubert*, 509 U.S. at 597–98, 113 S.Ct. 2786. The *Daubert* Court found that the Federal Rules of Evidence were inconsistent

---

11. Envirochem points to a sentence in Dr. Rigney's expert report stating that he "also reviewed the results of Ecolab Analytical's analysis of several Envirochem products, including all of the samples reported on in Bill Feil's memo to Tony Ossanna dated 9/6/95 (from which the data in Table 1 [of Dr. Rigney's 1995 affidavit] were taken)." *See* Hamlin Ex. 5, Rigney Rep. at 9. From the limited deposition excerpts Envirochem has included to support its argument, it appears that the Feil memo merely set forth the data emerging from the tests Dr. Rigney had supervised.

12. Rule 602 requires that testimony be based on personal knowledge of the matter. A party seeking to prove the facts underlying a third-party's statement could, lack personal knowledge of those underlying facts and Rule 602 would thus preclude their admission. Rule 802, the hearsay rule, which bars the admission of out-of-court statements offered to prove the truth asserted therein, would also serve to exclude the third-party's statement.

with—and thus displaced—the rigid "general acceptance" test that had previously controlled the admission of expert opinions, and held that a more flexible inquiry was appropriate. *See id.* at 588–89, 594–95, 113 S.Ct. 2786. Under this approach, the trial court should consider factors such as whether the theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether the technique has a high known or potential rate of error; whether standards controlling the technique's operation exist and are followed; and whether the theory or technique enjoys general acceptance within the relevant community. *See Kumho,* 526 U.S. at 149–50, 119 S.Ct. 1167 (summarizing *Daubert* ).

■ The Third Circuit has provided further guidance for the exercise of the gatekeeper role.[13] It has noted that Rule 702 embodies a liberal admissibility requirement and boils down to two major requirements: that the proffered expert be qualified to express an expert opinion and that the proffered opinion be reliable. *See In re TMI Litig.,* 193 F.3d 613, 664 (3d Cir.1999) (discussing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994)).[14] Although Envirochem does not

challenge Dr. Lentsch's qualifications, it claims that defects in his methodology produced an unreliable opinion on whether Envirochem's products are substantially uniform.[15] In determining whether the reliability standard—a standard that "is not that high," *Paoli,* 35 F.3d at 745—is met, the Court should assess the factors enumerated by the Supreme Court, along with the relationship of the technique to methods established to be reliable, "the qualifications of the expert testifying based on the methodology, and the non-judicial uses to which the method has been put." *Id.* at 742 n. 8. An expert opinion is "reliable under Rule 702 if it is based on 'good grounds,' i.e., if it is based on the methods and procedures of science. . . . The grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id.* at 744 (citing *Daubert* ).

Dr. Lentsch conducted an A & P 9600100 Standard Titration and an AP 9601200 Analysis of Products by ICP–OES.[16] The first method is an "acid titration of alkaline test" that "measures percent alkalinity in a test sample" and has a relative standard deviation of 0.17%. *See* Hamlin Aff. Ex. 4, Lentsch Rep. at 4.[17]

---

**13.** Although the law of the Federal Circuit governs all substantive considerations in patent cases, purely procedural matters that are not unique to patent law are governed by the law of the regional circuit. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 894 (Fed.Cir.1998). The evidentiary question of whether Dr. Lentsch's report is reliable is a procedural issue properly determined under the law of the Third Circuit. *See Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1276 (Fed.Cir.1999) (noting that evidentiary rulings are reviewed under the law of the regional circuit); *Bausch & Lomb, Inc. v. Alcon Labs., Inc.,* 79 F.Supp.2d 252, 254–55 (W.D.N.Y. 2000) (applying Second Circuit law in determining admissibility of expert testimony); *see also Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308 n. 2 (Fed.Cir.1999) (describing Rule 702 gatekeeping inquiry as relating "solely to the admissibility of evidence—a separate issue to claim construction").

**14.** There is also a "fit" precondition to admissibility, which requires a connection between

the proffered expert testimony and the disputed factual issues in a particular case. *See Paoli,* 35 F.3d at 742–43 (citing *Daubert* and *United States v. Downing,* 753 F.2d 1224, 1237 (3d Cir.1985)).

**15.** Envirochem often melds its reliability challenge with its challenge to the underlying findings. This Court has endeavored to address the two as distinct inquiries.

**16.** Titration is a method for determining the concentration of a desired substance in solution by adding a standard solution of known volume and strength until the reaction is completed. *See* Hawley's Condensed Chemical Dictionary 1110 (Richard J. Lewis, Sr., ed., 13th ed.1997). "ICP–OES" stands for Inductively Coupled Plasma–Optical Emission Spectrometry. *See* Hamlin Aff. Ex. 4, Lentsch Rep. at E–L 003538.

**17.** Standard deviation is a measure of the variability of numerical values about the mean of a set of measurements. *See* J. Sten-

Envirochem's own product literature validates titration: its technical data sheet for the E2000 product recommends use of an alkalinity test kit to confirm that the product titration is within the recommended concentration range. *See* Hamlin Aff. Ex. 9 at A 00159. Dr. Lentsch's second test was a "plasma emission spectrophotometric method for measurement of elements in a test sample," with a "relative standard deviation of only 3.4%." *See* Hamlin Aff. Ex. 4, Lentsch Rep. at 4. This test followed Ecolab's standard practice for measuring the phosphate content in its own products. *See* Hamlin Aff. Ex. 5, Rigney Rep. at 8.

In advancing its *Daubert* challenge, Envirochem has submitted no expert testimony of its own disputing Dr. Lentsch's methodology or any aspect of his report on any of the *Paoli* factors. Envirochem claims that it need not submit independent expert evidence, because the testimony of Ecolab's own experts underscores the inadequacies of Dr. Lentsch's methodology.[18]

### (1) *Products tested*

As a preliminary matter, Envirochem contends that Ecolab's experts' opinions are inherently and fatally flawed with re- spect to certain Envirochem products alleged to infringe the '818 patent.[19] Ecolab scientists did not test every alleged infringing product in the Envirochem product line. Dr. Lentsch tested the E2000HD (Dual Action Solid or Super Solid), the K75 (Ultimate Power II), and the K75W (Enviro 2000 Plus; UniKleen). Dr. Rigney's tests analyzed those three, along with the E2000 and the "Ultimate Power, Summermeyer."[20] Envirochem argues that Ecolab should have tested each individual product, and that the failure to do so renders any conclusions about the composition or performance of the untested products necessarily unreliable.[21] Ecolab retorts that because each of Envirochem's products is produced in the same way according to nearly identical formulae, Ecolab's researchers properly extrapolated their findings to the entire product line.

Envirochem attempts to found its argument on testimony of Ecolab's experts, who agreed that their test results did not reveal whether the tested samples were representative of either the particular product or the other products within the product line. Specifically, Envirochem points to the testimony of Dr. Rigney,

esch, Dictionary of Biochemistry and Molecular Biology 457 (2d ed.1989). In other words, the standard deviation reveals how close the individual results are to the mean.

18. In *Kumho*, the Supreme Court affirmed the trial court's exclusion of the proffered expert as unreliable, based largely on the testimony of the expert himself. In that case, nothing in the record indicated that any other experts in the industry used the testing methods employed by the proffered expert. In light of that, the Court noted that the Federal Rules of Evidence do not require trial courts to admit opinion evidence when the expert alone attests that the method is reliable. *See Kumho*, 526 U.S at 157, 119 S.Ct. 1167. Envirochem posits that a similar situation exists here, arguing that Ecolab's experts' testimony undercuts Dr. Lentsch's conclusions. This Court disagrees. There is ample evidence of record, including the testimony of Ecolab's experts, to support the reliability of the testing methodology.

19. This argument extends to the findings of both Ecolab experts. The other *Daubert* chal- lenges focus solely on the tests by Dr. Lentsch.

20. The brand names indicated in parentheticals come from Envirochem product specification sheets or other product literature put forth by Ecolab. *See* Hamlin Aff.Exs. 7, 14, 16. It appears that this final product, the "Ultimate Power, Summermeyer," is no longer in issue, as it is not mentioned in Ecolab's moving papers or in any of the product literature before the Court.

21. Envirochem also questions the testing of only a single sample of any particular product. *See* Env.Br. at 10. The evidentiary support offered for this challenge, the testimony of Ecolab scientist Dr. Peter Carr about the difficulties with testing a single sample, provides no solace to Envirochem. In that testimony, Dr. Carr critiques Envirochem's quality control procedures, and does not address the point Envirochem strives to make. *See* Weiss Cert.Ex. D, Carr Dep. at 200.

stating that he could not extrapolate his test results to the non-tested products. *See* Weiss Cert.Ex. C, Rigney Dep. at 97 ("I do not know whether or not these are representative data.").

Envirochem's argument—compelling at first glance—falters upon closer inspection. It is sensible that neither researcher was able to look at results of his testing and declare, based solely on those data, whether the same results would be obtained from other products. That logical limitation is not dispositive. The experts have made clear that certain additional information would reveal whether the tested products were representative, thereby permitting a determination whether the other products would yield identical results, even in the absence of separate testing. *See* Lentsch Aff. ¶ 5; Rigney Aff. II ¶ 5–6. At the time of their depositions, the doctors simply did not know whether the samples were representative. Due to trade secrets concerns, only one Ecolab employee, Peter J. Fernholz, was permitted to review Envirochem's product formula sheets. *See id.;* Fernholz Aff. ¶ 3.[22] Following his examination of that material, Fernholz averred that each product in the product line for which he reviewed a specification—which included the tested products—was prepared following a virtually identical formula and in accordance with a standard production method. *See* Fernholz Aff. ¶ 4; Hamlin Aff.Exs. 7, 16, 20. The tested samples were, therefore, representative.[23]

Envirochem has presented no testimony to suggest that it is improper to extrapolate the results from representative products. Indeed, the only evidence before the Court from people familiar with chemical analysis is to the contrary. The argument of Envirochem's counsel that such extrapolation constitutes "junk science" is utterly insufficient to cause this Court to disregard the tests or to defeat summary judgment. *Compare Heller v. Shaw Indus.,* 167 F.3d 146, 162 (3d Cir.1999) (finding methodology suspect in light of one of several authoritative studies in the record); *see also Continental Can Co. USA v. Monsanto Co.,* 948 F.2d 1264, 1265 (Fed.Cir. 1991) (noting that attorney's advocacy may not substitute for evidence). Ecolab's extrapolated results satisfy the threshold reliability requirement and may be considered on their merits.

### (2) *Machine Test*

Envirochem's next challenge concerns the "machine test" conducted by Dr. Lentsch. Dr. Lentsch tested three products from Envirochem's product line in a commercial institutional dishwashing machine, withdrawing the resulting solution for analysis after the first cycle and after every 50 cycles, over the life of the detergent cast. *See* Hamlin Aff.Ex. 4, Lentsch Rep. at 4. In all, 25 samples of dishwashing solution were analyzed for total alkalinity and phosphorous content. *See id.*

First, Envirochem suggests that the test failed to measure performance sufficiently at the beginning of each cast. Dr. Lentsch concluded that all samples contained sufficient and substantially uniform alkalinity throughout the cast life, and that 24 of the 25 samples contained sufficient phosphorous at each stage. The first sample removed from Envirochem's "Ultimate Power II" (product no. K75), however, did not contain sufficient phosphorous to soften water. Indeed, with respect to each product tested, Dr. Lentsch detected greater

---

**22.** Fernholz is the named inventor of the '818 patent. An employee of Ecolab since 1974, he is currently the company's Research and Development Vice President for Institutional and Laundry Technical Service. *See* Fernholz Aff. ¶ 1.

**23.** Ecolab states that the sole differences among the formulae appear in minor ingredients unrelated to the claims of the '818 patent. *See* Eco. Reply Br. at 8 (citing product formula sheets and Lentsch report's description of these ingredients (surfactants, defoamers, bleaching agents, enzymes, and corrosion inhibitors) as "minor components of the formulation"). Envirochem does not dispute that characterization.

variation in the phosphorous readings at the first cycle of each product than throughout the remainder of the test. *See id.* at .6. Dr. Lentsch explained that the machine's mechanics and a film on the surface of the cast accounted for slightly skewed results in the first cycle. By the fiftieth cycle and at each subsequent testing point, Dr. Lentsch found that each product yielded a solution with sufficient alkalinity and water softener.[24] No evidence by Envirochem questions those explanations.[25]

Envirochem lodges another untenable challenge to the reliability of Dr. Lentsch's testing based on the failure to measure the final cycles of the cast. The test protocol called for a sample to be withdrawn after every 50 cycles. *See* Hamlin Aff.Ex. 4, Lentsch Rep. at 4. Thus, if the product lasted for 390 cycles, the final measurement would occur after cycle number 350. Envirochem suggests that disregarding the cycles at the end of the cast renders the test unreliable. If Envirochem had submitted authority suggesting that the key to substantial uniformity or nonuniformity depended on the very end of the cast life, or if the test disregarded a possible 49 cycles out of a total of only 100, the difference might be material. In the absence of such authority, Envirochem's critiques, based purely on attorney argument, cannot undercut the reliability of the tests or the accuracy of their results.

Envirochem also challenges the fact that the test protocol did not require that the machine drain after each cycle, resulting in a solution that combined the wash solution from all of the cycles. As noted in footnote 24, *supra,* the fact that an aggregate solution was measured enhanced the reliability of the testing protocol, since any single cycle irregularity would not skew the results in either party's favor. Indeed, in light of this Court's claim construction, testing an aggregate solution is ideal, for it speaks precisely to the question of whether the detergent contains a level of continuity such that a homogenous solution is formed over the life of the cast. Moreover, testing an aggregate solution would reveal a nonuniform detergent just as clearly as testing each individual cycle would—the level of the ingredients in a nonuniform solution would gradually change to reflect the different composition of each subsequent cycle.

Envirochem's arguments are once again undermined by its failure to produce expert testimony or other authority in support. No one versed in scientific analysis whose testimony is before the Court suggests that testing an aggregate solution yields misleading results. This Court will not deem the test unreliable based purely on surmise and attorney argument.[26]

---

**24.** In an effort to undermine the reliability of Dr. Lentsch's test, Envirochem speculates that the Ultimate Power capsule could have yielded insufficient phosphorous for the first 49 cycles. Dr. Lentsch conceded at his deposition that he did not know the precise number of cycles during which that product produced insufficient water softener. Nevertheless, following cycle number 50, the solution—an aggregate of that produced in cycles 1 through 50—contained alkalinity and water softener "well within the recommended concentration ranges." Hamlin Aff.Ex. 4, Lentsch Rep. at 6. Envirochem has not introduced any authority to suggest that Dr. Lentsch's explanation of the first cycle deviation is insufficient. The difference in the first cycle does not render the tests unreliable. Indeed, it highlights how testing an aggregate solution, rather than the solution produced in any single cycle, is a more reliable measure.

**25.** In fact, Envirochem's evidence supports Dr. Lentsch's explanation of the higher phosphorous reading after the first cycle because Envirochem's nonuniform product was intended to yield greater concentrations of phosphate "at the *end* of the product's life cycle," not at its outset. Weiss Cert.Ex. J, Fleisher Aff. ¶ 8 (emphasis added).

**26.** Envirochem argues further that Dr. Lentsch's failure to inspect the capsules themselves during the tests rendered the tests unreliable because they failed to account for the pattern in which the casts dissolved. Again, no authority supports this assertion. Envirochem has failed to demonstrate that the manner in which the cast dissolves is at all rele-

Envirochem next condemns Dr. Lentsch's report for measuring total elemental phosphorous instead of distinguishing among different phosphate species. Since only certain phosphates are active water softeners, Envirochem argues that a measure of total elemental phosphorous, which encompasses both softening and non-softening phosphates, would inaccurately inflate the softening agents present in the Envirochem product. Envirochem premises this argument on the testimony of Dr. Rigney and Peter Fernholz concerning the differences among phosphates and asserts that Dr. Lentsch's measure of total elemental phosphorous inappropriately included phosphates such as orthophosphate, which is not an active water softener. Since the patent requires an effective amount of water softener (here in the form of softening phosphates) throughout the cast, a test of the Envirochem products that measured non-softening phosphates would misrepresent the relevant composition. Dr. Lentsch, however, explained that the tendency of certain water-softening phosphates to revert to inactive forms required that he measure total elemental phosphorous. He stated that excellent water softening would be achieved by ensuring that sufficient phosphorous with hardness sequesterant, i.e. water softeners, was present. See Hamlin Aff.Ex. 4 at 3.[27]

The testimony of Fernholz and Dr. Rigney concerning Envirochem's quality control procedures is not to the contrary. Dr. Lentsch's decision to measure total elemental phosphorous was made after determining that the only phosphorous products in Envirochem's detergent contained hardness sequestering agents. See Hamlin Aff.

Ex. 17, Rigney Dep. at 157–58. Dr. Rigney specifically tested for tripolyphosphate, which confirmed its presence in the detergent. With that understanding, Dr. Lentsch measured for phosphorous, which was known to contain hardness sequesterant and Dr. Rigney approved the two testing methods Dr. Lentsch employed. See id. at 161–62. Indeed, from the experts' testimony, it appears that attempting to measure the post-wash solution solely for tripolyphosphate would be unreliable, as it would not account for softeners that had been active but had since reverted to an inactive form.[28]

Finally, Envirochem cites Dr. Rigney's testimony and states that Dr. Lentsch's failure to run his test with dirty dishes rendered the machine test unreliable. Dr. Rigney did testify that without any information beyond an elemental phosphorous reading, he would not be able to assume that the detergent would clean dirty dishes. Before making that statement, however, Dr. Rigney admitted that such an opinion was "beyond [his] area of expertise" and deferred to Dr. Lentsch on whether the test would reveal the ability to clean dishes. See Weiss Cert.Ex. C, Rigney Dep. at 159. Dr. Lentsch determined that a solution composed of a certain level of alkalinity and water softener would clean well. Envirochem points to nothing to show that this was an impermissible assumption. Moreover, the conclusions about cleaning were not based solely on the total phosphorous level, since, as noted above, the decision to measure total elemental phosphorous was made only after determining that a sufficient level of tripo-

---

vant. The patent covers detergent with a substantially uniform structure that yields a substantially uniform solution and does not speak to the manner by which the cast structure must dissolve to form the solution. See generally Hamlin Aff.Ex. 2 (the '818 patent).

27. Sodium tripolyphosphate is the most common water softening phosphate used in the detergents. See Hamlin Aff.Ex. 4, Lentsch Rep. at 3.

28. This issue underscores the predicament into which Envirochem has placed the Court by asking it to credit or discredit complex scientific arguments without offering expert opinion. In the absence of conflicting expert testimony, the distinctions Dr. Lentsch has made appear well-reasoned and support a finding of reliability.

lyphosphate, a softening agent, was present in the detergent.

Envirochem urges this Court to follow the reasoning of *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1222 (9th Cir.1995). In that case, the parties offered competing expert opinions. The plaintiff's case rested on the testimony of an expert who had never examined the allegedly defective circuit breaker at issue there, but had simply reviewed the findings of the insurer's fire investigator and a photograph of the circuit breaker. *See id.* at 1219. The Ninth Circuit held that the trial court properly refused to credit his speculative findings about an alleged twenty-year old defect in a since-destroyed circuit breaker that he had never personally inspected. *See id.* at 1221. Here, by contrast, Dr. Lentsch created the protocol in accordance with standard laboratory tests and oversaw the testing—both indicia of reliability and personal knowledge. *Triton* thus does not undermine the reliability of Dr. Lentsch's findings.

Envirochem contends that the fact that Dr. Lentsch observed only approximately five percent of the cycles confirms that his data should not serve as the basis for summary judgment. The percentage of cycles Dr. Lentsch observed is a red herring that reveals little about his involvement. The machine test ran at least 350 cycles on the Enviro 2000 Plus and Enviro 2000 HD, and at least 400 cycles on the Ultimate Power II capsule. Samples were withdrawn every 50 cycles for a total of 25 samples. Thus, Dr. Lentsch's five percent

could have encompassed each cycle preceding and following a sample withdrawal. Of course, whether it did so is irrelevant. The fact that he developed the protocol and supervised its implementation in his laboratory suffices to establish his report and its conclusions as reliable and admissible, and does not undermine the integrity of his results.

Indeed, nothing in Envirochem's litany of complaints suggests remotely that Dr. Lentsch's tests were unreliable. As described throughout the preceding discussion, Dr. Lentsch's tests were conducted in accordance with an established testing protocol and Ecolab's standard testing practices. Indeed, Envirochem itself recommends using one of the techniques in connection with Envirochem's products. There can be no question that the techniques used have been tested, are approved in the relevant community, have a low rate of error,[29] and are commonly put to non-judicial uses, or that Dr. Lentsch was qualified to conduct the tests. Accordingly, they satisfy *Daubert* and *Paoli*, and may be considered on the merits.[30]

2. *Evidence of Substantial Uniformity*

■ As noted above, whether Envirochem's accused products read on claim 1 as properly construed is a question of fact.[31] The Federal Circuit has cautioned district courts to "approach a motion for summary judgment on the fact issue of infringement with great care." *Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 528 (Fed.Cir.1996). Mindful of that admonition, this Court may grant summary judg-

---

**29.** If they had a high rate of error, neither party would rely on these methods in the ordinary course of business.

**30.** Envirochem lobs a final challenge to the machine test, arguing that machine testing was inappropriate because it would find the prior art to be infringing. Despite Envirochem's contention, the lone page of deposition testimony from Steven Tinker about his affidavit does not make Envirochem's point. Although Envirochem failed to include the question that elicited this supposedly conclusive evidence, it is clear that Tinker does not address Dr. Lentsch's test in particular.

Moreover, even if machine testing alone would indicate that claim 1 read on the prior art, Ecolab's infringement evidence draws on two tests—composition and performance by Dr. Lentsch and structure by Dr. Rigney. Tinker's general "critique" of machine testing does not contemplate such a situation.

**31.** A properly construed patent claim "reads on" an accused infringing device "when every limitation recited in the claim is found in the accused device." *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.Cir.1996).

ment in Ecolab's favor if, based on the evidence before the Court, a reasonable jury could only conclude that the accused products contain all of the limitations of claim 1 of the '818 patent. Put differently, summary judgment of infringement is proper when there is no genuine issue of material fact as to whether Envirochem's products fall within the scope of claim 1.

Ecolab maintains that the findings of Drs. Lentsch and Rigney provide conclusive, undisputed evidence that Envirochem's products are substantially uniform. Envirochem, in contrast, asserts that even if the experts' data are considered, genuine issues of material fact still exist and summary judgment must be denied.

In the 1999 Opinion, this Court determined that nothing in the patent claims or prosecution history supported limiting the term "substantially uniform" to a particular numerical range. *See* 1999 Opinion at 21. Rather, the patent requires a level of continuity within the cast such that a homogenous solution is formed over the detergent's life. Ecolab's tests reveal that Envirochem's products are consistent with that limitation.

From his test of three Envirochem products, Dr. Lentsch opined that the "products are homogenous throughout the capsule and provide sufficient hardness sequestering agent and alkali metal hydroxide in the dishmachine at all times." Hamlin Aff.Ex. 4, Lentsch Rep. at 2. The variations in the percentages of alkalinity and phosphorous are, according to Dr. Lentsch, "considered small and insignificant from a dishwashing performance standpoint" and are "as expected in an industrial dishmachine." *Id.* at 6. Dr. Lentsch found that the Envirochem products were not stratified, were "substantially uniform" (even "very homogenous")

throughout the detergent capsule. *See id.* at 7. He concluded that the Envirochem products infringe claim 1 of the '818 patent.

Dr. Rigney's analysis of five accused Envirochem products measured the percentage of sodium tripolyphosphate (water softener) and sodium hydroxide (alkali) at five segments along the cast length. Each product revealed "absolute variation in tripoly content throughout the capsule of significantly less than 20%." Hamlin Aff.Ex. 5, Rigney Rep. at 10. He concluded that the cast contained sufficient alkalinity and water softener at each level of the cast and that the products are "substantially uniform because there is enough alkalinity to clean and enough hardness sequestering agent to treat the water throughout the product." *Id.* at 9. Dr. Rigney as well concluded that the Envirochem products infringe claim 1 of the '818 patent.

As an initial matter, the Court must determine whether Dr. Lentsch's and Dr. Rigney's findings extend to those items in Envirochem's product line that were not tested.[32] As explained in Part II(A)(1)(b)(1), *supra*, Drs. Lentsch and Rigney did not concede that they could not extrapolate the results to other products. The scientists instead testified that they could not conclude that the untested products were substantially uniform without knowing that the tested products were representative of the entire product line. Upon reviewing the Fernholz affidavit, Drs. Lentsch and Rigney learned that the entire product line was produced according to a virtually identical formula (with differences only in immaterial components) and according to the same production method. *See* Lentsch Aff. ¶¶ 5–7; Rigney Aff. II ¶¶ 5–7. Based upon that information, both Ecolab experts concluded that the untest-

---

**32.** In making this determination, the Court has not relied upon Ecolab's argument that Envirochem abused the discovery process in refusing to produce each product in the product line. One Ecolab request followed by an Envirochem objection does not constitute discovery abuse. Ecolab has set forth no evidence to show that it pursued its demand for production beyond the initial request, and this Court will not reprimand Envirochem for any failure to produce any products.

ed products would yield identical results evidencing substantial uniformity.

Envirochem has not put forth any evidence to suggest that such an extrapolation is inappropriate or yields distorted results. General arguments that each alleged infringing product must be tested do not suffice to create a genuine issue of material fact.[33] In light of the uncontroverted evidence approving the extrapolation of test results based on formula and production specification as yielding reliable, accurate results, the Court will extend any finding of infringement to the other products in the product line, with the exception of product no. E2000XHW.[34]

Using standard testing methods for Ecolab's own products, the experts determined that the Envirochem products infringe claim 1 of the '818 patent. Ecolab's compelling evidence of infringement shifts the burden of production and obliges Envirochem to point to the existence of any genuine issues of material fact.

 Envirochem has put forth a document, entitled "Enviro 2000 Product Comparison," reporting a different structural composition than that found by Dr. Rigney and claims that these data from earlier Ecolab tests show great deviation in phosphate concentration throughout the cast.

*See* Weiss Cert.Ex. L. That piece of evidence fails to create a genuine issue of material fact as to whether Envirochem's products infringe the properly construed claim. Envirochem's argument fails for several reasons. Although these Ecolab data are presented with no reference to methodology or the objective of the study, in their briefs, both parties note that the table was prepared by Ecolab as a summary of tests comparing Ecolab and Envirochem products. *See* Env.Br. at 24; Eco. Reply Br. at 13. A determination of infringement must be based on a comparison of the alleged infringing device with the claims of the patent, and not a comparison of the alleged infringing device with the patented product. A product to product comparison such as this may not be considered as evidence in an infringement analysis. *See Zenith Labs., Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed.Cir.1994).

Moreover, in light of the Court's claim construction, merely presenting numbers that show a greater variation from top to bottom than Ecolab's experts have found is insufficient to create a material question of fact about nonuniformity. As this Court previously determined, substantially uniform cannot be confined to a precise nu-

---

**33.** In *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 711 F.Supp. 1205, 1221–27 (D.Del.1989), cited by Envirochem, the court construed the claim at issue and then compared its construction of the patent's resin density requirement to the resin density of each of nine alleged infringing products. That each product was compared in that case does not suggest that extrapolation was improper here. The only evidence before this Court from experts states that based on the testing of certain products and the product formulae and production specifications, the other products would yield identical results. Envirochem has offered no legal or scientific authority to suggest that the extrapolation to other products is inappropriate.

**34.** There is no evidence before the Court to suggest that the tested products are representative of Envirochem's product E2000XHW. Ecolab has not submitted a formula sheet for this product. Although Ecolab asserts that

E2000X and E2000XHW are identical, the only evidence in the record to support this is a product formula sheet for E2000X bearing the description "Enviro 2000 XHW Solid." *See* Hamlin Aff.Exs. 7, 16. Without a specific product formula sheet, there is no permissible basis to extrapolate Dr. Lentsch's or Dr. Rigney's findings to this product. The statement by Ecolab's counsel that the two products are identical is not evidence, and the E2000X formula sheet describing the product as "Enviro 2000 XHW Solid" does not suffice to show that there are no genuine issues of material fact as to whether E2000XHW infringes. Accordingly, with respect to this product, Ecolab's motion for summary judgment of literal infringement is denied. If, however, E2000XHW is merely a brand name for the product manufactured according to the E2000X formula specification, then any production of that product must comport with this Court's ruling on E2000X.

merical range. Indeed, with regard to numerical ranges, the only range associated with the term uniformity appearing in the '818 patent is found in a description of chlorine recovery. Reference to the patent specification describes the invention as showing "very uniform" chlorine recovery, which varies throughout cast life by as much as 20%. See '818 patent, Fig. 5 and col. 22, lines 53–68. No data on the Enviro 2000 Product Comparison indicates a 20% deviation.

Envirochem's counsel argues that chlorine recovery is inapposite to the question of uniformity. Ecolab's experts disagree. They reference the 20% figure in their expert reports as indicative of a range that would satisfy the substantial uniformity limitation. See Hamlin Aff.Ex. 4, Lentsch Rep. at 7, Ex. 5, Rigney Rep. at 10. As noted time and again, evidence—not attorney argument—creates genuine issues of material fact. Envirochem's argument is not supported by any expert testimony or other evidence. The record evidence is unanimous in its reference to the 20% figure as a "very uniform" result. Thus, even were the Court to consider Envirochem's number-based arguments, they would not suffice to rebut the sole record evidence deeming a 20% variation to be well within the definition of substantially uniform.

Envirochem posits that evidence of non-uniformity is found in the affidavits of Dr. Theodorus Van Es and Howard Fleisher, submitted in opposition to Ecolab's preliminary injunction motion. See Weiss Cert. Exs. I, J. Fleisher, Envirochem's president, described the prosecution of the '641 patent and submitted a table documenting the chemical analysis of samples of the same Envirochem products sent to Ecolab for analysis. Van Es, in turn, compared

those data with those set forth in the Tinker Affidavit, submitted by Ecolab during patent prosecution.[35] Van Es looks to the Tinker Affidavit for a definition of "substantially uniform" and based on that affidavit, concludes that Envirochem's products are not substantially uniform. In the 1999 Opinion, this Court expressly rejected Envirochem's argument that the Tinker Affidavit provided the definition of substantial uniformity. As such, Van Es offers no new or discrete insight into the question presently before the Court: whether the Envirochem products infringe the properly construed claim. Any argument of nonuniformity based on the figures in the Tinker Affidavit is irrelevant, and does not point to the existence of genuine issues of material fact.

Another basis Envirochem advances for showing that genuine issues of material fact exist relates to the method for producing the detergent. Envirochem asserts that because it does not produce its detergents in accordance with either of the methods Ecolab disclosed during patent prosecution for making a uniform cast detergent, it could not have infringed. This contention is unavailing. As an initial matter, although the '818 patent covers both a product and a method for making that product, the claim at issue here relates solely to the product itself. There is no assertion that Envirochem infringes the method claims of the patent. Furthermore, nothing in the patent or its prosecution history suggests that the substantially uniform homogenous cast detergent can only be produced in accordance with the two methods discovered by Ecolab. Finally, the product claim at issue here makes no reference whatsoever to the method for producing the cast. Thus, the method by which Envirochem produced its cast deter-

---

**35.** At oral argument, Envirochem attempted to characterize the Van Es affidavit as expert testimony. Van Es was not named as a witness—expert or otherwise—in the final pretrial order in this case. Envirochem's failure to designate his testimony in the pretrial order provides another basis to exclude his tes-

timony. See Fed.R.Civ.P. 16(e); *Beissel v. Pittsburgh & Lake Erie R.R. Co.,* 801 F.2d 143, 150 (3d Cir.1986). The Court need not exercise that discretion, however, because Envirochem has not demonstrated that his affidavit is probative of the issues before the Court.

gents is irrelevant to the question of infringement of claim 1.

Finally, this Court must determine whether the fact that Envirochem received the '641 patent on a method for making nonuniform, stratified detergents creates a genuine issue of material fact. Although the fact of separate patentability is relevant, it "presents no legal or evidentiary presumption of noninfringement." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1582 (Fed.Cir.1996); *see also National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191–92 (Fed.Cir.1996). Significantly, the '641 patent is a method patent. If the method claims of the '818 patent were at issue here, the existence of the '641 method patent might very well suffice to preclude summary judgment. As Envirochem is accused of infringing the product patent aspect of the '818 patent, however, a patent on a different method for making an allegedly different product fails to satisfy Envirochem's burden.[36]

Envirochem has thus failed to rebut Ecolab's evidence of substantial uniformity. Envirochem may not rely on attorney argument, given its failure to introduce expert testimony, to create material issues of fact and this Court will not find that questions exist based upon those arguments. Although this Court must draw all reasonable inferences in favor of the non-moving party, the nonmoving party's nonfeasance cannot give rise to genuine issues of material fact. *See, e.g., Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1358–59 (Fed. Cir.1998) (affirming summary judgment where defendant cited no evidence to refute "clear conclusion" of literal infringement). Accordingly, Ecolab has met its burden on proving infringement of the "substantially uniform" element of claim 1 of the '818 patent.

## B. *Other Elements of Claim 1*

From its inception, this dispute has focused on the claim's use of the phrase "substantially uniform," and whether Envirochem's products meet that claim limitation. There has never been a substantial question that the remaining limitations of claim 1 are met by Envirochem's detergents.[37] The products in Envirochem's commercially sold detergent product line are three-dimensional, solid, cast, hydrated, alkaline detergents used for ware washing. *See, e.g.,* Weiss Cert.Ex. G, '641 patent at col. 1, lines 7–9, col. 2, lines 50–62, Ex. J, Fleisher Aff. ¶¶ 7, 9, 16, 18; Hamlin Aff.Ex. 7 (detailing composition of products), Ex. 14 (listing chemical composition of K75W ("E2000 Plus") as "caustic base, water and soil conditioners; alkalinity builder and buffer").[38] That, along with

---

**36.** Ecolab has submitted certain Envirochem product literature as evidence of substantial uniformity. Ecolab argues that the literature's failure to mention the nonuniform structure and its similarity to Envirochem's advertising for its concededly infringing Jardian line demonstrate that the Envirochem products are, in fact, substantially uniform. Envirochem notes that by portraying its detergent as the "next generation," it highlighted the change from the previous uniform detergent. Although advertising may properly be considered as evidence of infringement, *see Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed.Cir.1995), this Court does not find the advertising particularly probative one way or the other with respect to substantial uniformity. The absence of advertising about nonuniformity is of negligible relevance or value. Equally unpersuasive is the deposition testimony of Envirochem customers who

agree that the solid cast detergents of both Ecolab and Envirochem clean dishes well. The fact that Envirochem never informed its customers that the internal structure of dishwashing detergent was nonuniform proves nothing. Indeed, one customer noted that she had not known that previous detergents had a uniform structure. *See* Hamlin Aff.Ex. 13, Gray Dep. at 48.

**37.** Indeed, Envirochem's brief in opposition to summary judgment responds only to Ecolab's arguments regarding substantial uniformity, and not to Ecolab's claim chart demonstrating that all other limitations of claim 1 read on the accused products.

**38.** Caustics, such as caustic soda, are alkaline substances. *See* Webster's Third New International Dictionary 356 (1993).

substantial uniformity, satisfies the preamble and part (a) of claim 1.

The accused products are also "at least about 30% by weight of an alkaline hydratable chemical consisting essentially of alkali metal hydroxide," which meets the limitations of part (a)(1) of claim 1. *See* Hamlin Aff.Ex. 7 (product specification sheets showing liquid caustic soda ($NAOH_5O$) content ranging from 42.66% to 46.74%), Ex. 8 (Rigney Aff. I). The Envirochem products also contain an effective amount of a hardness-sequestering agent, consistent with part (a)(2) of the claim. *See, e.g.,* Hamlin Aff.Ex. 6, Lynn Dep. at 205–06, Ex. 7 (showing presence of STTP and Acusol 445). The products contain water of hydration, at least a portion of which is associated with the alkali metal hydroxide, as required by part (a)(3). *See* Hamlin Aff.Ex. 7 (showing presence of liquid caustic soda and caustic soda beads).[39] Finally, the Envirochem products are solid and cast in receptacle-shaped disposable containers with one open surface, thus meeting the limitations contained in part (b) of the claim. *See, e.g.,* Hamlin Aff.Ex. 3 at 2 (Envirochem Brief of Jan. 21, 1998) (describing product as "disposable plastic jars filled with powerful detergent for use with commercial dishwashing machines"), Ex. 14.

Envirochem has not pointed to any evidence to contradict the finding that the other elements of claim 1 read on the Envirochem products. As Envirochem's products are also substantially uniform, they embody each element of claim 1 of the '818 patent. Accordingly, no genuine issues of material fact exist and Ecolab is entitled to summary judgment of literal infringement on all products in the Envirochem solid cast detergent product line at issue, with the exception of product number E2000XHW. In light of this finding, this Court will enjoin Envirochem from making, using, or selling the infringing

products in the United States or in any foreign country.

### CONCLUSION

For all of the foregoing reasons, Ecolab's motion seeking summary judgment on its claim of literal infringement is granted.

### ORDER

This matter having come before the Court on the motion of plaintiff Ecolab, Inc., seeking summary judgment on the issue of literal infringement; and the Court having considered the parties' submissions, and good cause appearing

IT IS on this 23rd day of May, 2000

ORDERED that Ecolab's motion for summary judgment on the issue of literal infringement is granted with respect to Envirochem solid cast detergent products numbered E2000, E2000D, E2000HD, E2000X, K75, K75W, and K75WD;

IT IS FURTHER ORDERED that, in light of this Court's determination that the aforementioned Envirochem solid cast detergent products literally infringe U.S.Patent RE 32,818, Envirochem is enjoined from making, using, or selling those aforementioned products;

IT IS FURTHER ORDERED that Ecolab's motion for summary judgment on the issue of literal infringement is denied with respect to Envirochem product number E2000XHW; and

IT IS FURTHER ORDERED that a copy of this Order be served on all of the parties within seven (7) days of the date of this Order.

---

**39.** As noted earlier, the detergent is solid at room temperature, which is also a component of part (a)(3) of the claim.